THE NEW JERSEY POULTRY PRODUCERS' ASSOCIATION (Co-operative), complainant-appellant,

*v.*

HANS TRADELIUS, impleaded, &c., defendant-respondent.

[Submitted May term, 1924.  Decided October 20th, 1924.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Ingersoll, who filed the following opinion:

"The complainant is a corporation of this state, formed under the provisions of 'An act to provide for the formation and regulation of co-operative agricultural, dairy or horticultural associations,' chapter 154, laws of 1920, page 300.

"The defendant Hans Tradelius was one of the incorporators of the association, and was elected a director thereof, and remained and acted as such for a considerable period.

"The bill was discontinued in so far as the defendant Fred Gillis is concerned.

"Prior to the incorporation of the association, several public meetings of these interested were held in Vineland and its vicinity, at some of which the defendant was present.

"One man, at least, who was active in the organization of the association, and at these meetings, was a paid organizer.

"Prior to the incorporation a form of "membership agreement was prepared, one of which was signed by Tradelius on the 15th day of June, 1921.

"*Inter alia* that agreement provided:

" '10 (a) Every member shall pay an entrance or organization fee of ten dollars.

" '10 (b) Every producer shall pay into the working fund of the association ten dollars ($10) for every hundred hens owned by him, based on the capacity in his poultry plant at the time of signature

hereto. The producer may pay cash and receive a discount of seven per cent. therefor; or he may pay the same in four equal installments, evidenced by four negotiable promissory notes, bearing interest after maturity only, due three (3), six (6), nine (9) and twelve (12) months after date. The association is authorized to deduct from the proceeds due to the producer one-twelfth (1/12) of the said sum each month after July 1st, 1921, and to apply such deductions toward the payment of each note when due.

" The said working fund, created by this and other deductions, shall be construed as an advance made by the producers to the association, which association shall have the right to use for its proper purposes and to apply on any of its indebtedness, and the net balance of such fund, with all accumulations, shall be distributable to the producers, proportionately, on the basis of its cash value, after July 1st, 1924, on such terms and conditions as the association may deem fair and proper.

" Each producer shall be credited with his proportionate share therein and shall receive six per cent. interest upon such share, payable annually. A withdrawing producer shall not receive any interest after notice of withdrawal but his share in the fund shall be distributed to him within sixty days after notice of withdrawal, in cash, or at the option of the association, in notes, payable without interest not more than two years thereafter.

" The association shall confine itself to the problems and marketing of eggs only, and for its members only. It shall have suitable articles of incorporation and by-laws stating the purposes and powers of the association; the rights and duties of members; manner of forfeiture of membership; value of property interest on withdrawal, and any other necessary pertinent and important points of organization, as determined by the organization committee.

" The association shall be organized by an organization committee, consisting of a chairman, two vice-chairmen, a secretary, treasurer, and forty-two additional members; elect new members in place of any who may resign or be unable to act; appoint an executive committee of five to conduct its detailed affairs; open headquarters; incur necessary obligations and make necessary expenditures, and take such steps as it may deem advisable to secure subscribers for this agreement and members of the association. The secretary-treasurer shall be adequately bonded.

" 'If the signature of the owners of 150,000 hens shall be secured by the said date [July 1st, 1921], this agreement shall be binding upon all of the subscribers in all of its terms, and there shall be no right of withdrawal whatsoever.

" The subscriber agrees (1) to execute, when requested by the association, a marketing agreement in terms substantially the same as those set forth in the agreement herewith embodied, or (2) at the option of the board of directors, to be bound by the terms of the following marketing agreement.

" 'For such purpose, signature to this association contract shall be deemed to all effects the same as signature to the said marketing

agreement, and as acceptance of the exercise of such option by the board of directors. Notice thereof shall be mailed to each subscriber at his address noted below.

" 'The producer is a member of the association and is helping to carry out the express aims of the association for co-operative marketing, for minimizing speculation and waste and stabilizing egg markets in the interest of the producer and the public, through this and similar obligations undertaken by the other producers.

" 'The association agrees to market and the producer agrees to consign and deliver to or upon the order of the association, daily or semi-weekly, to such point as may be designated by the association, all the eggs produced for him in New Jersey, during the years 1921, 1922 or 1923, and until July 1st, 1924, that he intends to sell or market, or consign or deliver, directly or indirectly, for sale or marketing, or consignment, to any person, firm or corporation whatsoever. The producer shall have the right to use or sell eggs for hatching or for immediate neighborhood consumption.

" 'The association shall market only the eggs of its members and nothing else, and it shall handle all such eggs from its members only upon the basis set forth herein.

" 'The producer hereby constitutes and designates the association his lawful and duly appointed agent coupling such agency with a direct financial interest as the common agent of producers signing similar agreements, to sell all of such eggs for the producer and as his exclusive agent; and, as such agent, the association shall have full power and authority in its own name or in the name of the producer, as it may elect, to transact such business and take such action as it may deem necessary, incidental or convenient for the accomplishment of any of the purposes herein set forth This agency shall be irrevocable during the term hereof.

" 'The producer expressly warrants that he has not heretofore contracted to sell, market, consign or deliver any of his said eggs to any person, firm or corporation, except as noted at the end of this agreement. Any eggs covered by such existing contract shall be excluded from the terms hereof for the period and to the extent noted.

" 'The association shall pool or mingle the eggs of the producer with eggs of a like grade and quality delivered in the same week by other producers. The association shall grade and classify the eggs and its grading shall be conclusive.

" 'The association shall be the sole judge of the standard, quality and grade of the eggs, and shall adopt such method of standardization as will be the most advantageous in general.

" 'The association may make rules and regulations, and provide inspectors to standardize the quality, method and manner of handling, packing and shipping of eggs for any purpose, and the producer agrees to observe and perform any such rules and regulations prescribed by the association.

" 'Any deduction or allowance or loss or expense that the association, in its discretion, may make or suffer or incur on account of eggs of inferior quality or standard or undesirable conditions as

determined by the association, shall be charged against the producer and be deducted from his net returns hereunder.

" 'The producer expressly agrees that all eggs delivered hereunder shall be free from damage of any kind, and in good marketable and merchantable condition, and shall be delivered to the association as, when and where it shall direct.

" 'The association agrees to resell such eggs, together with eggs of like grade and quality delivered by other producers under similar contracts at the best prices obtainable by it under market conditions, and to pay over the net amount received therefrom [less freight, insurance and interest] as payment in full to the producers named in contracts similar hereto, according to the eggs delivered by each of them, after deducting therefrom, within the discretion of the association, the costs of maintaining the association, and of handling, grading and marketing such eggs, and of reserves for credits and other commercial purpose. Said costs and reserves must not exceed two cents per dozen on all eggs handled by the association. Any surplus from such deductions must be prorated among the producers delivering eggs in that year on the basis of deliveries.

" 'In addition to the said deduction, the producer agrees that the association shall deduct from his proportionate net returns hereunder one-half cent [½c.] per dozen of eggs, to be placed in the working fund. The producer shall receive credit for such deductions, but shall not be entitled to withdraw any portion thereof unless and until the association so directs at the expiration of this agreement. The said working fund shall stand as an asset of the association, and shall be responsible for any indebtedness thereof; and the interest of the producer therein shall be a proportionate property interest, after payment of any and all indebtedness of the association, distributable only after July 1st, 1924, and upon such universal terms as the association may adjudge proper, prorated on the basis of the then actual value thereof.

" 'The producer agrees that the association may handle, in its discretion, some of the eggs in one way and some in another; may sell some upon delivery, may store or process all or any portion thereof; but the net proceeds of all eggs of like quality and grade, less charges, costs and advances, shall be divided ratably among the producers in proportion to their deliveries to each pool.

" 'The amount to be paid to the producer weekly shall be based on the proportional value in eggs delivered by him to the association, out of the total receipts of moneys from the sale or other disposition of the eggs and loan value of unsold eggs, according to quality and grade, less the deductions hereinabove mentioned, all as determined by the association.

" 'The association shall, in its discretion, store or warehouse eggs to be held for the season of minimum production or for a better market or otherwise. Any eggs so stored or warehoused shall be deemed to have been stored at the current loan value on the dates of storage as conclusively determined by the association, and shall be distributed as part of the weekly receipts as above provided.

" 'Any net profits, after paying all warehousing charges, interest, taxes, insurance and other costs, resulting from the ultimate resale of such eggs by the association, shall be divided proportionately, on the basis of the value of the respective deliveries, among the producers delivering eggs to the association during the period in which such eggs are stored, all as determined conclusively by the association.

" 'Any losses, after paying all warehousing charges, interest, taxes, insurance and other costs, resulting from the ultimate resale of such eggs by the association shall be chargeable against and be paid by the producers proportionately on the value of the respective deliveries of the producers delivering eggs to the association during the period in which such eggs are stored, all as determined conclusively by the association.

" 'The association may, in its discretion, sell or consign any of the eggs to hotels, restaurants, retail stores or other large users of eggs, and the costs of any such business, as determined conclusively by the association, shall be charged against the proceeds therefrom in addition to the deductions provided in paragraph 7 hereof, before the receipts are mingled with the total weekly receipts for distribution among the producers hereunder.

" 'The producer agrees that the association may handle and market the eggs, some in one way and some in another, all in its sole and exclusive discretion.

" 'The producer agrees to supply or provide his own crates or cases and fillers, as approved by the association.

" 'The producer further agrees that the association shall have the power, without limitations, to borrow money in its name and on its own account on the eggs delivered to it, or on any accounts for the sale thereof, or any drafts, bills of lading, exchange, notes, acceptances, orders, or any commercial paper delivered therefor, and to exercise all rights of ownership without limitations, and to pledge, in its own account, drafts, bills of lading, bills of exchange, notes, acceptances, orders or other commercial paper as collateral therefor. The association may prorate the money so received to the producers, or, in its absolute discretion, use the same for any legal purpose or activity of the association, or distribute the same equitably among the producers on the basis of deliveries.

" 'The association may establish selling offices, warehouses, plants, marketing, statistical or other agencies in any place.

" 'The producer shall have the right to stop producing eggs and to grow anything else at any time at his free discretion; but if he produces any eggs, or acquires or owns any interest in any eggs, during the term hereof, they shall all be included under the terms of this agreement, and must be sold only to the association.

" 'This agreement shall be binding upon the producer during the term hereof as long as he is a poultry producer or possesses any legal interest in poultry or poultry products, and he shall be obligated by all the terms hereof for any eggs produced or acquired by or for him.

" 'This agreement is one of a series generally similar in terms comprising with all such agreements, signed by individual producers, or otherwise, one single contract between the association and the said producers annually and individually obligated under all the terms thereof. The association shall be deemed to be acting in its own name for all such producers in any action or legal proceedings on or arising out of this contract.

" 'The producer agrees that in the event of a breach by him of any material provision hereof, particularly as to delivery or marketing of any eggs other than to or through the association, the association shall, upon proper action instituted by it, be entitled to an injunction to prevent further breach hereof and a decree for specific performance hereof, according to the terms of this agreement; and the association and the producer expressly agree that this agreement is not a contract for personal service or demanding exceptional capacity and talents, and that this is a contract for the purchase and sale of personal property under special conditions and circumstances, and that the association limits its purchases of eggs to producers co-operating with it under this form of contract, and cannot go out into the open markets and buy eggs to replace any which the producer may fail to deliver, and that this contract will be the proper subject for the remedy of specific performance in the event of a breach thereof.

" 'It is expressly agreed that this instrument is one of a series substantially identical in terms. All such instruments shall be deemed one contract for the purpose of binding the subscribers to the same extent as if all of the subscribers had signed one such contract.'

"The certificate of incorporation is dated August 9th, 1921, acknowledged the same day and recorded in the clerk's office of Mercer county, and filed in the office of the secretary of state on August 12th, 1921.

"The defendant Tradelius, as one of the incorporators, signed and acknowledged the certificate, and his name and post-office address is included in the list of subscribers to said certificate.

"Among the provisions in said certificate are:

" 'II. The class of services to be performed by the association shall comprise all and any services, of any kind whatsoever, connected with the preservation, drying, canning, storing, handling, utilization, marketing and sale of eggs, poultry, and egg and poultry products produced by the members of such association.

" 'III. The territory in which the association's operations are to be conducted is the State of New Jersey, the several states and territories of the United States of America, the colonial possessions or territorial acquisitions of the United States of America, and such foreign countries as shall from time to time be found convenient for the purposes of the association's business.'

"In clause VII Hans Tradelius is named as a director for the first year.

" 'VIII. The date of the commencement of its business or fiscal year is the 9th day of August, for the year 1921, and thereafter, the 1st day of January in each year.

" 'IX. The following provisions are hereby adopted governing the regulation and conduct of the association's affairs, namely—

" '(a) The limit of amount of indebtedness or obligation of the association for which the individual members or directors shall individually, jointly or severally be liable, is the sum of $10 for each such member and director, provided, however, that such limitation shall not apply to debts due to laborers, servants and employes of the association.

" '(b) The board of directors of the association shall, when so provided by the by-laws, have power to appoint an executive committee of such number of its members as the by-laws shall from time to time prescribe, which executive committee shall have and exercise all the powers of the board of directors which may be lawfully delegated in the management of the business and affairs of the association, subject to the by-laws, and shall have power to authorize the seal of the association to be affixed to all papers which may require it.'

"On August 12th, in pursuance of waiver and consent, all of the incorporators and members were present at a meeting held for organization, and unanimously consented to adopt and approve the by-laws, and a form of standard marketing agreement contained therein was adopted to be effective until July 1st, 1924, and also adopted the following resolutions:

" '*Resolved.* That the members of the New Jersey Poultry Producers' Association [Co-operative], do hereby approve, ratify and confirm the selection of the directors named in the certificate of incorporation of the association, as and for the board of directors of the association for the ensuing year.'

"The following preamble and resolutions were unanimously adopted:

" 'WHEREAS. The members and incorporators of this association are desirous of assenting to the acceptance of said membership agreement as the obligation of this association, and of admitting the signatories to said membership agreement into full membership and participation in the affairs of the association;

44

*Therefore, be it resolved,* That the board of directors of this association, as constituted by the certificate of incorporation thereof, be and the same is hereby authorized and directed to adopt the form of membership agreement prepared by the organization committee of this association, so far as the same is not inconsistent with law and with the by-laws of this association; as the obligation and contract of this association; to elect all signatories to said membership agreement to membership in the association in the manner prescribed by the by-laws thereof; to cause each such member to receive credit in full, on the books of the association for such sums as such member shall have paid to the organization committee, as though such sums had been paid by such member to the association; to accept the balance of funds in the hands of the organization committee as the funds of the association, and to cause all items of disbursements made by the organization committee out of the funds received by it, to be charged to the organization expenses of this association.'

"At one-thirty o'clock in the afternoon of said August 12th, 1921, pursuant to waiver and notice signed by each of the members of the board [all of whom were present in person], the directors met and elected officers. The board also ratified, approved and accepted the report of the organization committee.

"The following resolution was unanimously adopted:

" '*Resolved,* That the form of membership agreement prepared by the organization committee of this association, be and the same is hereby adopted as the obligation and contract of this association so far as the same is not inconsistent with the law of New Jersey, the certificate of incorporation of the association and the by-laws of the association, and the terms thereof shall be binding upon the association as a contractual obligation to and with each signatory thereof; and

" '*Further resolved,* That each of the following signatories to such membership agreement be and the same is hereby elected a member of the association, namely :'

[Here follows a long list of names and addresses, included in which is Tradelius H.  Vineland, N. J.]

" '*Further resolved,* That the treasurer of the association be and he hereby is authorized and directed to give credit to each of the members of the association, on the books of the company, for the full sum paid by such member to the organization committee, both by way of entrance fee and by way of initial payment to the working fund, notwithstanding the fact that the organization purposes and to charge all expenditures made by the organization committee, prior to the organization of this association, to organization expense.'

"The standard marketing agreement appearing in the by-laws of the association was adopted as the form to be used until July 1st, 1924.

"On August 19th, 1921, a meeting of the board of directors, Tradelius being present, the following was adopted:

"'Market provisions of the New Jersey Poultry Producers' Association [Co-operative].'

"The following provisions of marketing the eggs was unanimously adopted by the board of directors:

"'*First.* W. H. Mapes Company offer a portion of their quarters at 137 Reade street, rent free, as the association New York headquarters.

"'*Second.* All eggs marketed by the association shall be distributed through the New Jersey Poultry Producers' Association [Co-operative], offices on 137 Reade street, New York City, of which the W. H. Mapes Company are selling agents.

"'*Third.* The term wholesale to mean eggs sold to other wholesalers, jobbers or retailers that apply to the distributing agency, bargain and pay for same as all other eggs are sold at wholesale.

"'*Fourth.* Any eggs sold in less than five case lots will be termed retail.

"'*Fifth.* Any eggs sold by the W. H. Mapes Company to retailers through their salesmen, and delivered by their trucks in the same manner as their regular jobbing business is conducted, shall be returned for the average price obtained at wholesale for the balance of the same shipment.

"'*Sixth.* W. H. Mapes Company to return to the association, weekly, the exact amount obtained for all the eggs sold at wholesale [less the following deductions].

"'A. The salary, of approximately $30 per week, of one employe or representative of the association whose duty shall be to assist in the unloading, marketing and loading after sale, keeping records of sale, accounts, &c., in the interests of the association.

"'B. If, after the expiration of three months, the executive committee of the association makes a permanent agreement with the W. H. Mapes Company for the distribution of their eggs at a fixed brokerage, commission price or otherwise, that brokerage commission or price shall be retroactive and include the eggs handled during the previous three months.

"'*Seventh.* The W. H. Mapes Company to give a satisfactory bond of $25,000 to guarantee all payments to the association.

"*Eighth.* In the event of the association establishing a grading station at the New York headquarters, we will furnish quarters for said grading and any expense for operating said department to be

borne by the association, said association employe to manage and keep records of any expense that shall be borne by the association.

"*Ninth.* That the W. H. Mapes Company shall handle or sell no other eggs that would interfere with the interests of the association eggs. This to be determined by the W. H. Mapes Company and the association manager.

" 'This agreement to the effective on the date of first shipment of eggs by the association.'

"At a meeting of the directors held November 8th, 1921 [Tradelius being present], the following report of committee was presented, and the following motion unanimously adopted:

" 'Mr. Ells reported for the subcommittee of the executive committee to make arrangements with Mr. Mapes for the sale of association eggs. He said that Mr. Mapes had offered to handle the association eggs on a basis of 3 per cent., or 1½ cents a dozen for all eggs sold in New York City, and 1 cent a dozen for all those sold outside of New York. Mr. Mapes stated that so far as he was concerned he felt that they could make better arrangements at any time during the year they should be free to accept, and that so far as he was concerned he would be willing to handle the eggs without a contract. Motion was made that the association accept Mr. Mapes' offer of 1½ cents per dozen for those outside of New York. Motion lost.

" 'Motion was made that the association offer Mr. Mapes 1½ cents per dozen for all eggs sold in New York, and ½ cent for all sales on the outside. Carried unanimously. President Whetsel and Mr. Ells were requested to inform Mr. Mapes of the association's action, and obtained his answer. President Whetsel reported as follows: Mr. Mapes had offered the services of the W. H. Mapes Company to handle all eggs sold by the association whether they came to New York or were sold outside of New York for the first eight calendar months of the year at 1 cent per dozen; for the last four calendar months of the year the rate shall be 1½ cents for all eggs sold in New York and 1 cent a dozen for those sold outside of New York.

"Moved and seconded that the offer of Mr. Mapes, as reported by President Whetsel, should be accepted. Carried unanimously. The secretary was requested to draw up an agreement with Mr. Mapes.'

"At a special meeting held on April 8th, 1922, an election was held for the purpose of electing seven members of the board of directors to fill vacancies caused by the resignation of the following directors from district No. 1: James Whetsel, Elmere Wene, B. S. Ells, John H. Weed, H. Tradelius, Fred Gillis, A. E. Spear.

"One of the most important arguments used in the securing of the membership agreement was that the corporation could for the members save the expense of a broker or middle man. The agreement provided that the association must not deduct more than two cents per dozen for expenses of operating the association, any amount remaining unused of that sum to be returned to the producer. An additional one-half cent per dozen could be deducted for the working fund, but producers to be given credit therefor. It was provided further in said agreement that the association may, in its dis·cration, sell to hotels, &c.

"The minutes of the board of directors of February 14th, 1922, are very illuminating as to complaints of members:

" 'We, the members of the New Jersey Poultry Producers' Association of the third district, feeling that the association is not accomplishing the aims for which it was organized, offer the following criticisms and recommendations to the board of directors of the association, feeling that these criticisms and recommendations will be received in the same spirit in which they are offered

" '*Criticisms*—We believe the payment to Mr. Mapes of from $15,000 to $25,000 per year to sell our eggs to the same trade we formerly sold to direct before the association was formed is an unnecessary expenditure.

" 'We do not believe Mr. Mapes should receive a commission for all eggs sold, regardless of whether eggs are sold by him or by the association direct.

" 'We believe that the salary of $4,800 per year paid to our general manager is exorbitant when considering his present duties.

" 'We feel that the total expenses to the association of from $20,000 to $30,000 per year for salaries and commissions, plus expenses for candling, grading and packing the eggs, &c., is greater than necessary.

" 'We feel that no financial benefits come to the individual members of the association through the expenditure of this large sum of money.

" 'We feel that the eggs are not being graded uniformly, which causes direct loss to the individual members, and makes it impossible to make a reputation for the association's eggs.

" 'We feel that directors did not have the authority to order that candling be discontinued, as this is contrary to our by-laws. Paragraph No. 5, marketing agreement, specifically states: "The association shall pool the eggs of the producer with eggs of like grade and quality." How is the quality of an egg determined except by candling?

" 'And we further feel that the association as now conducted offers no inducements, from a financial standpoint, for poultrymen to become members of the association and to the members already in the association to continue to sell their eggs through it.

" *'Recommendations*—We recommend that all eggs be carefully candled and correctly graded, and graded, if possible, by mechanical means to insure uniform grading at all packing houses.

" 'We recommend that all eggs be stamped with our trade-mark to identify them to consumers, as this will enable the association to create a real reputation for its product.

" 'We recommend that the association hire a competent sales manager, who shall be solely in the employ of the association. One who has the ability and knowledge to sell to retail dealers. His salary to be, in part, on a commission basis in order to give him an incentive to sell our eggs at the best price obtainable under existing marketing conditions. It might also be possible for the sales manager to have supervision over packing houses and the Trenton office.

" 'We recommend that a sales office in New York City be opened by a sales manager for the distribution of our eggs to the retail trade.

" 'We recommend that in seasons of over-production the association's eggs be stored in bonded cold storage warehouses in order to stabilize the market.

" 'We recommend that the total selling and grading costs be not over two cents per dozen, and we further recommend that an additional one cent per dozen be deducted. This money to be used solely for "direct to consumer" advertising, in order to stimulate the sale of the association's eggs. This would make a total of three cents per dozen deducted for selling, grading, packing and advertising costs, but does not include cost of cases and transportation.'

"It is proven and not disputed that Tradelius did not comply with the terms of the agreement signed by him, but from December 13th, 1921, did dispose of his output of eggs to others than the complainant company.

"The complainant prayed for a preliminary injunction against the defendant, which was denied.

"Tradelius' successor as director was elected on April 8th, 1922, although his resignation was tenderd some time prior thereto, and the last meeting of the directors at which he was present appears to be November 8th, 1921.

"The relief now prayed for is a decree for discovery and an accounting for the liquidated damages provided for in subdivision (c) of paragraph 18 of the agreement, which is as follows:

" 'Inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association should the producer fail to deliver to the association all of the eggs herein agreed to be delivered, the producer hereby agrees to pay to the association seven cents for each dozen eggs sold, consigned, delivered or marketed by or for him in violation of this agreement, as liquidated damages for the breach of this contract in that regard, all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the contracting parties to each and all of the said contracts.'

"The answer filed sets up the following defenses:

"1. That the contract, which the complainant is seeking the specific performance of, was procured by misrepresentations and fraud.

"2. That complainant made breaches.

"3. That the contract is in restraint of trade.

"4. That the contract is hard and oppressive and destitute of all equity.

"5. That the contract lacks the mutuality of obligation as well as the mutuality of remedy, and is therefore unenforceable.

"If the second point is found in favor of the defendant, it is unnecessary to consider any of the other points. raised.

"An examination of the evidence is necessary to determine the question.

"Did the complainant make such breach of the contract on its part as to release the defendant from the obligation of it?

"The evidence is convincing that the company did retain more than two cents per dozen for expenses of operating the association.

"Sales were made through a sales agent or broker at great expense.

"The complainant contends that it is and was authorized to do so, and to pay for same, by subdivision (c) of section 8 of the marketing agreement.

"It is evident that this clause does not empower the sale to a broker, or the employment of a broker or middleman [as such agent was called]. The association recognized this

statement, as since this suit was instituted this clause has been amended to include 'dealers.'

"The explanation of this section is—that hotels, restaurants and large users of eggs might be induced to pay a premium for a higher class of goods than is usually found on the market, and that any additional expense in making such sales would be more than offset by the premiums received.

"With this explanation in mind, a sale to a broker at regular rates certainly could not be included in the terms of this section, even if its language was not clear, as it is.

"This association was to grade and classify the eggs     This was not properly done. It was admitted that grading was too severe in 1921. It ceased candling the eggs, and sometimes candled only samples.

"It was also conclusively shown that the defendant received for his eggs an amount very much less than he would have received had he made sales in the general market.

"An examination of the returns made by the association to Tradelius shows payments by it in some instances of as high as seventeen cents per dozen less than the market quotations.

"Financially, the association was in a precarious condition, and it was conducted in an unbusinesslike manner. Each monthly report of the financial condition, made from October, 1921, to May, 1922, showed checks drawn in excess of cash balances of from $870.77 to $11,136.63.

"The report for September 10th, 1921, to November 30th, 1921, showed a net loss in the Vineland district of $4,347.75, and a total net loss of the association of $4,996.83.

"The report of the advisory committee of the Toms River Local, No. 3, made at the request of the president of the association at a meeting of the board of directors held February 14th, 1922, while not evidential of the facts contained therein, is very illuminating as to the condition and conduct of the business of the association as recited above.

"It will also be noticed that organization expenses were $8,574.92, as per the report in the minutes of the executive

committee meeting of December 16th, 1921. While as per the same report, the amount paid in for membership fees amounted to $4,440.

"Without now further restating the testimony, I am satisfied that the complainant is not now in a position to obtain equitable relief against the defendant, unless he [the defendant] is estopped from setting up a claim that the contract has been rescinded or waived by his acquiescence or laches.

"While it is true that Tradelius was a director of the association and participated in many of the meetings of the directors, particularly in the contract with Mapes, concerning which he cannot be heard to complain, I am convinced that otherwise he is not barred from setting up the defenses claimed by him, and that the bill must be dismissed."

*Mr. Louis H. Miller* and *Mr. George L. Record,* for the appellant.

*Mr. Thomas G. Tuso* and *Mr. John W. Wescott,* for the respondent.

PER CURIAM.

The facts in this case, which are voluminous, are quite fully and accurately set out in the conclusion filed by the learned vice-chancellor, who heard the case. Our examination of the record and a consideration of the facts lead us to the same conclusion as that of the vice-chancellor, viz., the complainant's bill of complaint should be dismissed. The decree of the court of chancery is therefore affirmed and the bill of complaint dismissed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS—15.

*For reversal*—None.