The Monmouth County Farmers' Co-operative Association was organized under the provisions of an act entitled "An act to provide for the formation and regulation of co-operative agricultural, dairy or horticultural associations." P.L. 1920ch. 154 p. 300. That act was amended by P.L. 1922 ch. 11 p.36, and repealed by P.L. 1924 ch. 54 p. 105. 1 Cum. Supp. Comp.Stat. p. 659. The objects of the association as expressed in its charter and by-laws are as follows:
 "Article II. Objects.
"Sec. 1. The objects of this association are to perform for its members, as agent, service connected with the production, manufacture, preservation, drying, canning, storing, handling, utilization, marketing or sale of agricultural, dairy or horticultural products produced by them, and for the agricultural, dairy or horticultural purposes of such members, may perform for them services connected with the purchase or hiring for or use by them of supplies including live stock, machinery and equipment, and the hiring of labor, or any one or more of the kinds of service specified in this section."
Pursuant to section 9 of the act referred to, by-laws were adopted fixing the qualifications of members and the conditions of membership in the association and containing amongst other provisions the following:
 "Section 4 — Article IV.
"At the time of uniting with the association each member shall deliver to the association a negotiable promissory note, payable on demand to the order of the association. Such note shall be for the sum of $100."
The by-laws also contained provisions for the withdrawal of members, for the conduct of the business by the board of directors and that all business with its members should be transacted on a cash basis. At the time of the filing of this bill the association had over three hundred members, each of which had given to the company a note for $100 in the following form: *Page 259 
"JANUARY 1ST, 1921.
$100.xx/100
For value received, I promise to pay on demand to the Monmouth County Farmers' Co-operative Association or order the sum of one hundred dollars.
This note is given in accordance with Article [IV] of the by-laws of said association. It shall be used as collateral security for loans obtained for the use of the association and shall be available in settlement of any liquidated damages that may result from my failure to live up to my contract with the association.
JOHN DOE."
In the course of its business transactions it became necessary for the association to borrow money from time to time, and at first these notes were used with the banks as collateral security for the notes of the association. Later this became impracticable and the directors of the association were required by the banks to personally endorse notes discounted. The association fell into financial difficulties and judgments were obtained by banks against the association and the endorsing directors. These judgments were paid by the directors upon an assignment of the judgments to one of their number as trustee for all. Other notes of the association endorsed by the directors were dishonored and assumed or paid by the endorsing directors. Demand was made upon the members for the payment of their promissory notes and also for the payment of additional liability over and above the amount of the notes by those members who were financially responsible, because of the default of the other members, who, as the result of vicissitudes of the farming industry had become financially irresponsible. The additional liability, the members who were financially responsible, refused to pay. This bill was thereupon filed asking for the appointment of a receiver, the determination of the liabilities of the association, the fixing of the liability of the various members to the directors who had assumed or paid obligations of the association, and to other creditors, and an assessment or assessments against the members for their respective liabilities, an accounting, and such other relief as might under the circumstances be equitable and just. Besides the association itself, there were over three hundred *Page 260 
members made defendants in this suit. Many of them have not answered and decrees pro confesso have been entered against them. The answering defendants defend on the ground, first, that the directors had no legal right to incur the indebtedness which they have assumed; second, that the liability of each of the defendants was limited to $100 by the by-laws; third, that no one of the members can be held liable for any amount beyond his proportionate per capita share of his indebtedness; fourth, that the individual liabilities of the defendants cannot be determined until the association has exhausted every legal recourse against the members of the association in recovering from them losses incurred by the association in transactions between it and such members in which the particular answering defendant member has not participated; fifth, that the losses of the association were due to the negligence of the directors and that by reason of such negligence they are barred from recovery; and sixth, that the director creditors are estopped from pressing their claims because of representations made by them to members respecting the limitation of members' liability.
Pursuant to the prayer of the bill, and by consent of those defendants appearing, a receiver has been appointed and application is now made for a reference to a master in order that an accounting might be had in accordance with the prayer of the bill. For the guidance of the master before whom the accounting will be had, it is deemed advisable that the basis of the liability of the respective members be fixed in advance of the reference and that is the purpose of this memorandum.
Ample authority is found in section 8 of the act referred to for the borrowing of money and the incurring of the obligations by the directors of the association involved in this suit, and it requires no evidence, other than that submitted on this application, to indicate that the acts of the directors complained of by the answering defendants were duly authorized by appropriate resolutions and were well within their rights and powers, and not ultra vires. *Page 261 
The second and third defenses of the answering defendants are based upon the words of the act itself and the following provision in the by-laws:
"Article IX. No individual member shall be personally liable for a sum greater than the amount of his member's loan note."
The adoption of this by-law was an abortive attempt to limit the liability of the members of the association. It is not "within the limitations of this act." P.L. 1920 p. 303 § 9.
Section 13 of the act under which this association was organized fixes the liability of its members in the following language:
"Each member shall be responsible as his original liability, for his proportionate share, which shall be that proportion that his voting power bears to the aggregate voting power of all the members, of all contracts, debts and engagements of the association existing at the time he becomes a member and created during his membership; but if any member's share of such contracts, debts and engagements shall prove to be uncollectible each remaining member shall be responsible as his additional liability for such unpaid share or part thereof to an amount equal to such remaining member's original liability or to such further amount as may be prescribed in the certificate of incorporation; such additional liability, however, to be in the same proportion that the said remaining member's voting power bears to the aggregate voting power of all the remaining members. No member shall be liable to the association for any contract, debt or engagement arising out of any specific transaction between the association and any member or members thereof in which he does not participate unless and until the association shall have exhausted every legal recourse and failed to enforce satisfaction from the member or members participating therein. In all cases any member who, voluntarily or otherwise, contributes to the payment of the debt or obligation of another member or other members shall have an action, several or joint, as he may elect, against such defaulting member or members for reimbursement. Any association may, in its certificate of incorporation, limit the amount of indebtedness or obligation which may be incurred by or on behalf of the association, and no member shall be liable for any debt or obligation in excess of the terms of such limitations. Any association may, in its certificate of incorporation, limit the amount of indebtedness or obligation for which the individual members or directors shall individually, jointly or severally be liable; provided, however, such limitations shall not apply to debts due to laborers, servants and employes of said association." *Page 262 
No limitation upon the amount of indebtedness to be incurred by or on behalf of the association, or on the individual liability of the members, was contained in the certificate of incorporation. The provision above quoted from the by-laws is unauthorized and ineffective as a limitation upon the members' liability. The scheme of the act is that the members' liability shall be per capita and the act itself limits that liability to double the amount of the original liability. The liability of each member of this association is therefore, in the first instance, his proportionate per capita liability of all the indebtedness of the company. This is on the assumption that each and every member of the association is financially responsible and that each member's share of such indebtedness is collectible from him. In the event that any member's share of the association's indebtedness is uncollectible, the additional liability of each remaining member is his per capita share of the uncollectible share or shares of defaulting members, such additional liability being limited, however, to the amount of the member's original liability. If, therefore, there were three hundred members of this association, the original liability of each member would be one three-hundredth of the association's indebtedness. If one hundred of the members were irresponsible and their respective shares could not be collected by the association, the remaining two hundred members would be obliged to share proportionately the share of the one hundred defaulting members. Each of the remaining members would then be liable for one two-hundredth of the share of the one hundred defaulting members, such liability being limited, however, to the amount of the "original liability." Assuming, therefore, that the indebtedness of the association was $30,000, the original liability of each of the three hundred members would be one three-hundredth of $30,000 or $100. If we assume that one hundred of the members are irresponsible and their respective proportionate shares of such indebtedness uncollectible, $20,000 of the indebtedness would be assumed and paid by the two hundred responsible members in discharge of their "original liability" and the remaining $10,000 would *Page 263 
also have to be assumed by the two hundred responsible members on a per capita basis, and the proportionate share of each "responsible member" in this deficit would be $50, making the total liability of the two hundred responsible members $150 each. But, if there were only one hundred responsible members their respective original liability would be $100 each or $10,000, and their "additional liability" under the statute would be another $100 each of $10,000. This would mean that only $20,000 could be collected for the payment of obligations amounting to $30,000. But creditors would have no cause for complaint as the provisions of the statute are plain and all creditors must be assumed to have dealt with the association with full knowledge of its resources and the liabilities of its members. In determining the members' liability, the master will, of course, be guided by the express words of the statute which provide that the member shall be liable for debts, c., "existing at the time he becomes amember and created during his membership." The date of any member's effective withdrawal in accordance with the provisions of article 4, section 9 of the by-laws (a provision within the limitations of the statute) is therefore important.
It has been stipulated that all the debts of the association arise from association notes, some or all of which were personally endorsed by directors. Judgments on some of these notes have been obtained by the creditor bank in suits against the association and the endorsing directors and such judgments paid by the directors to whom, or for whose benefit, they have been assigned. Other notes so endorsed have been paid or assumed by such directors and some, I understand, are still held by creditor banks. These directors, as assignees of the judgments, or as holders of the notes, now stand in the place and stead of the banks from which they were taken and are entitled to the same rights and remedies as the banks had for their collection. This being so, it is unnecessary to consider the effect of article 9 of the by-laws as among the members themselves, a question which was raised at the oral argument. *Page 264 
As to the fourth defense set up in the answers, this is based upon the allegation that many of the losses of the association were due to the fact that the association did business with its members on a cash basis; that when, therefore, potatoes were delivered to the association, a price was fixed for them and the member was paid that price; that the potatoes were immediately shipped by the association, but because of fluctuations in prices after the price to the member had been fixed and paid, the association suffered losses and such members received more for their products than they should have received; that in other instances the produce marketed by the association did not come up to the standard grade at which it was shipped and paid for, and that losses were incurred on this account also. By the terms of the charter and by-laws the association, in marketing the produce of the farmer members, was acting as agent of the members and substantially as a clearing house and there is no doubt in my mind that under the provisions of the act, the charter and by-laws, where the members had been overpaid for their products they became indebted to the association for the amount of the losses suffered by the association because of such overpayment unless the loss was due to some negligence, fault or misconduct of the association itself in the marketing of these products. Assuming that there are responsible members of the association who are liable to it for losses thus incurred by it, and I understand that fact to have been stipulated, it will be the duty of the receiver to prosecute an action or actions against those members for the amount of such losses; but the fact that there are such claims does not prevent the fixing of the primary liability of the members for the indebtedness of the association at this time. It would be inequitable to require the directors of the association who have assumed its indebtedness to carry those obligations until all such suits by the receiver have been prosecuted to final conclusion.
The defense referred to is based upon that portion of section 13 of the act which provides that "no member shall be liable to the association for any contract, debt or engagement *Page 265 
arising out of any specific transaction between the association and any member or members thereof in which he does not participate unless and until the association shall have exhausted every legal recourse and failed to enforce satisfaction from the member or members participating therein." The impossibility of passing finally upon this defense at this time is apparent because from its very nature it must rest upon a different state of facts with respect to different answering defendants. In any event, however, it would be improper at this stage of the proceedings to take such alleged liability of the particular members for such losses into account in fixing the primary liability of all its members. It will be the duty of the receiver to protect the responsible contributing members by enforcing the liability of the individual members referred to in this defense by appropriate means, if possible, and any moneys recovered by the receiver on account of such claims would, after application to expenses of the receivership, be distributable proportionately amongst those members contributing toward the payment of the debts of the association. In this way the rights of all the members will be amply protected.
With respect to the question of assessment against the members for such sum as is necessary for the payment of the debts of the association and the costs of this proceeding, there is no doubt in my mind as to the power of the court to levy such assessment within the limits of the liability fixed by the act.
There is no evidence before the court at this time upon which any finding as to negligence of the directors, payment by any member of his liability, or on the question of estoppel by reason of false representation of directors, might be based. These and all other questions not herein specifically disposed of are reserved until the coming in of the master's report. The act pursuant to which this association was organized has been before the courts of this state but in one other instance so far as I know (New Jersey Poultry Producers` Association v. Tradelius,96 N.J. Eq. 683), and the questions here involved were not there considered; but the *Page 266 
legal and equitable principles applicable here are elementary and require no citation of authorities. I will advise an order referring this matter to a master for the purpose of taking an account and fixing the liability of the responsible members in accordance with the prayer of the bill and for the purpose of taking any testimony or evidence which the parties desire to submit on the question of negligence or estoppel. All further proceedings in this cause will be stayed until the coming in of the master's report.